FILED

2014 Mar-06  AM 11:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| KEVIN O. JACKSON, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:12-0794-KOB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Claimant, Kevin O. Jackson, brings this action pursuant to the provisions of 42

U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner

of the Social Security Administration denying his application for Supplemental Security

Income. Jackson timely pursued and exhausted his administrative remedies available

before the Commissioner. Accordingly, this case is now ripe for judicial review under 42

U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the

parties, the court finds that the decision of the Commissioner is due to be affirmed.

## I. STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the

Commissioner is supported by substantial evidence and whether proper legal standards

were applied. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end

this court "must scrutinize the record as a whole to determine if the decision reached is

reasonable and supported by substantial evidence. *Id.* (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id*. This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Id*. Even if the court finds that the evidence preponderates against the Commissioner's decision, the court must affirm if the decision is supported by substantial evidence. *Id.*

Unlike the deferential review standard applied to the Commissioner's factual findings, "no similar presumption of validity attaches to the [Commissioner's] conclusions of law, including determination of the proper standards to be applied in reviewing claims." *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982) (quoting *Smith v. Schweiker*, 646 F.2d , 1075, 1076 (5th Cir. Unit A Jun.1981)). Therefore, this court reviews de novo the Commissioner's conclusions of law. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## II. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

2

expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Social Security regulations outline a five-step process that the Commissioner uses to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). The Commissioner must determine in sequence:

(1)   whether the claimant is currently engaged in substantial gainful activity;

(2)   whether the claimant has a severe impairment or combination of impairments;

(3)   whether the claimant's impairment meets or equals the severity of an impairment in the Listing of Impairments;[1]

(4)   whether the claimant can perform any of his or her past work; and

(5)   whether there are significant numbers of jobs in the national economy that the claimant can perform.

*Winschel v. Comm'r of Soc. Sec*, 631 F.3d 1176, 1178 (11th  Cir. 2011). The evaluation process continues until the Commissioner can determine whether the claimant is disabled.

---

[1]   The Listing of Impairments, ("Listings") found at 20 C.F.R. Part 404, Subpart P, Appendix 1, are used to make determinations of disability based upon the presence of impairments that are considered severe enough to prevent a person from doing any gainful activity. 20 C.F.R. § 404.1525.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant who is doing substantial gainful activity will be found not disabled at step one. 20 C.F.R. §§ 404.1520 (a)(i), 416.920(a)(4)(i). A claimant who does not have a severe impairment will be found not disabled at step two. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A claimant with an impairment that meets or equals one in the Listing of Impairments will be found disabled at step three. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Prior to considering steps four and five, the Commissioner must assess the claimant's residual functional capacity (RFC), which will be used to determine the claimant's ability to work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant who can perform past relevant work will be found not disabled at step four. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five the burden shifts to the Commissioner to show other work the claimant can do. *Foot v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). To satisfy this burden the Commissioner must produce evidence of work in the national economy that the claimant can do based on the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1512(f), 416.912(f). A claimant who can do other work will be found not disabled at step five. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920 (a)(4)(v). A claimant who cannot do other work will be found disabled. *Id.*

In the present case, the Administrative Law Judge (ALJ) determined Jackson was not engaged in substantial gainful activity, and found he had the following severe impairments: "history of pancreatitis, left eye implant, polysubstance abuse, history of a

motor vehicle accident from June 2010 with a closed head injury with multiple skull fractures, depression, anxiety, organic mental disorder, and borderline intellectual functioning." R. 24.

The ALJ concluded Jackson's impairments, including his substance use disorder, met Listing 12.09, which covers Substance Addiction Disorders. R. 25. However, Jackson cannot be found disabled if alcoholism or drug addiction is a "contributing factor material to the Commissioner's determination that the [claimant] is disabled." 42 U.S.C. § 423(d)(2)(C). Therefore, the regulations require the ALJ to determine whether Jackson's "drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 416.935(a). In making this determination, the ALJ must determine which of Jackson's physical and mental limitations would remain absent drug or alcohol use. 20 C.F.R. § 416.935(b)(2). If Jackson's impairments would not be disabling if he stopped abusing drugs and alcohol, then his substance abuse is a "contributing factor material to the determination of [his] disability." 20 C.F.R. § 416.935(b)(2)(i).

The ALJ found that if Jackson's substance abuse stopped, his remaining impairments would still cause more than a minimal impact on his ability to work. Therefore, he found Jackson would continue to have a severe impairment even if his substance abuse ceased. R. 25. However, he found that in the absence of substance abuse, his remaining impairments would not meet or equal any of the listed impairments. R. 25.

The ALJ found that if Jackson's substance abuse stopped, he would have the residual functional capacity (RFC) to perform "light work as defined in 20 CFR 416.967(b) that allows for non-complex job tasks, no binocular vision, no work around unprotected heights, no exposure to dangerous machinery, no more than occasional climbing of ladders and scaffolds, and contact with the general public and co-workers that is brief and non-intensive." R. 27. With this RFC, the ALJ found Jackson unable to perform his past relevant work. R. 30.

When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines ("the grids") to establish the presence of other jobs at step five.[2] *Foote*, 67 F.3d at 1558-59. The presence of a non-exertional impairment (such as pain, fatigue, or mental illness) also prevents exclusive reliance on the grids. *Id.* at 1559. In such cases "the [Commissioner] must seek expert vocational testimony." *Id.* Based on Jackson's RFC in the absence of substance abuse, and the testimony of a vocational expert (VE), the ALJ found Jackson could perform other work in the national economy. R. 31, 126-28.

---

[2]    The Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, are used to make determinations of disability based upon vocational factors and the claimant's residual functional capacity when the claimant is unable to perform his vocationally relevant past work. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a). Such determinations, however, are only conclusive when all of the criteria of a particular rule are met. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a).

Therefore, the ALJ found he was not disabled at step five of the sequential evaluation framework. R. 32.

### III. FACTUAL BACKGROUND

Jackson filed an application for Supplemental Security Income (SSI) on September 30, 2008, and alleges he became disabled on May 25, 2008. R. 22. However, Supplemental Security Income benefits are not payable until the month following the month in which the application was filed. 20 C.F.R. § 416.335. Jackson was 28 years old at the time of the ALJ's decision. R. 30. He has a limited education, and past relevant work as a masons helper, painter, and laborer.[3] R. 30.

Jackson was unable to attend his first scheduled ALJ hearing on June 9, 2010, because of injuries  sustained in a motor vehicle accident on June 4, 2010. However, the ALJ took testimony from a medical expert (ME), who had been scheduled to testify. R. 133-37. At his second ALJ hearing on March 1, 2011, Jackson testified he is unable to work due to headaches, blackout spells, chronic pancreatitis, and back pain. R. 115. He also testified that he suffers from panic attacks, in which his hands tingle and he becomes short of breath. R. 118.

The medical records show Jackson has a history of chronic pancreatitis. He received treatment for that condition on a number of occasions prior to the time he filed

---

[3]  Jackson had also worked as a deli worker and a cleaner of coke machines, but the ALJ found it was questionable whether those jobs satisfied the earnings requirement to qualify as past relevant work. R. 30.

his application for SSI benefits. Jackson was admitted to the Flowers Hospital on May 10, 2006, with an acute exacerbation of chronic pancreatitis. He improved with IV fluids, fasting, and analgesics, and left the hospital against medical advice on May 14, 2006. R. 332. On February 18, 2007, Jackson was admitted to the Highlands Medical Center hospital with acute pancreatitis. R. 416-18. Although he denied using street drugs, his urine drug screen tested positive for opiates, benzodiazepines, and marijuana. R. 417. The diagnostic assessment on admission was acute mild pancreatitis, abdominal pain, and possible drug seeking behavior. R. 418. He was discharged on February 21, 2007. R. 416. On July 2, 2007, Jackson was seen in the Marshall Medical Center South emergency room with abdominal pain, and was diagnosed with chronic pancreatitis. R. 222-25. On June 1, 2008, Jackson was treated in the Marshall Medical Center North emergency room for gastritis. R. 362-66.

Prior to his application for SSI, Jackson also received treatment for various injuries. Jackson was treated for complaints of pain in his right knee after jumping off of a porch on January 9, 2007, for a motorcycle accident that occurred on November 4, 2007, and for a left elbow contusion on August 3, 2009. R. 431-32, 399-415, 361.

On June 4, 2010, Jackson suffered a closed head injury and skull fracture when he jumped from a car while intoxicated. R. 279. Jackson's urine drug screen was positive for methamphetamine and marijuana. Jackson's skull fracture did not require surgery, and he

8

improved during his hospital stay. Jackson was discharged on June 8, 2010, with instructions to followup with neurosurgery and ENT within two weeks. R. 280.

Jackson was treated at the Huntsville Hospital emergency department on June 21, 2010, with complaints of a headache and dizziness for the past two days. R. 484. A CT scan of the brain revealed no new findings. R. 489. He was diagnosed with post concussion syndrome, headache, and ear infection. He was prescribed antibiotics for an infection in his left ear, and Lortab for pain. R. 491. Again on June 27, 2010, Jackson sought treatment at the Marshall Medical Center South emergency room for a headache. R 375. A CT scan showed no acute intracranial abnormality. R. 376.

On July 25, 2010, Jackson was treated at the Huntsville Hospital emergency department complaining of a headache with ear and facial pain. R. 459. He reported that when he "looks up his whole body starts to tingle and he falls on the ground and blacks out." R. 460. An MRI of the brain showed "[m]inimal white matter signal abnormality perhaps related to previous injury." R. 478. Jackson was diagnosed with headache, dizziness, and mastoiditis. He was discharged with prescriptions for antibiotics and Lortab. R. 471.

On August 20, 2010, Jackson sought treatment at the Highlands Medical Center emergency room for a headache with right ear bleeding. R. 393-98. He was discharged with instructions to followup with his ENT. R. 398.

9

On September 24, 2010, Jackson followed up with Dr. Bennett, at Vanderbilt University Medical Center, for treatment of facial nerve paralysis and hearing loss caused by his motor vehicle accident. Jackson's facial paralysis was improved. He had only a "very minimal amount of asymmetry of his smile," and his eye closed completely. Jackson reported significant head pain, and Dr. Bennett recommended he see a neurologist locally. Dr. Bennett gave him Ultram, but refused to give him narcotics. R. 539.

On November 25, 2010, Jackson presented to the Highlands Medical Center emergency room with complainants of pain in his back after being tackled while playing backyard football. R. 387. He was diagnosed with a myofascial strain and given pain medications. R. 388. This is the last treatment note in the record.

Jackson was referred by his attorney to Dr. Rogers for a psychological evaluation on February 23, 2011. R. 321-31. Jackson reported to Dr. Rogers that he had a few friends, and that he socialized with his family. He reported that his "[h]obbies and interests include fishing, watching TV and going to the races." R. 322. Jackson "reported abusing marijuana, speed, and pain pills," but he denied dependency. R. 323. He told Dr. Rogers "he last smoked marijuana 3-4 weeks ago; and last used pain pills 4 days ago." R. 323. Dr. Rogers noted Jackson's "appearance was good," and he was "nicely groomed." R. 323.

10

On mental status examination, Dr. Rogers found Jackson's affect was restricted, and his mood appeared anxious and depressed. His orientation to time, place and person was good. R. 323. He was able to perform the serial 7's subtraction task, and correctly answered three math problems. He "could correctly repeat 5 digits forward and 3 digits backwards and could recall three objects after five minutes." R. 324. He was able to discuss his activities the previous day and could recall the birthdays of family members. He was also able to name the President. R. 324. Jackson was unable to interpret  the proverbs. His judgment and insight were fair. R. 325. Testing administered by Dr. Rogers indicated clinically significant depression and anxiety. R. 326-27. He noted Jackson "reported depression and anxiety are factors in his employability." R. 327. Dr. Rogers found Jackson's "[p]roblems include difficulty concentrating," and opined the cognitive damage was probably the result of traumatic brain injury (TBI). R. 327.

Dr. Rogers diagnosed Jackson with Cognitive Disorder NOS due to TBI; Depressive Disorder NOS; Anxiety Disorder NOS; and Cannabis Abuse, in remission by self report. R. 327. Dr. Rogers assessed Jackson's GAF at 48.[4] Dr. Rogers also completed forms indicating Jackson had marked impairments in his concentration, persistence or

---

[4]  The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning. *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th Edition) ("DSM-IV"). A GAF of 41-50 indicates:  "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **or any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). DSM-IV at 32 (emphasis in original).

pace; his ability to respond to customary work pressure; his ability to understand, carry out, and remember instructions in a work setting; and his ability to perform repetitive tasks in a work setting. R. 329-30. Dr. Rogers indicated these levels of severity would apply without consideration of substance abuse. R. 330.

After the second ALJ hearing, the ALJ sent Jackson to Dr. Randolph for a psychiatric evaluation. R. 543-548. Jackson reported to Dr. Randolph that since his accident, he misplaces items, has poor memory and has perseverative speech.[5] Dr. Randolph noted Jackson reported past use of stimulants and marijuana, "but states he has been abstinent for a year." R. 546.

On mental status examination, Jackson scored 20 out of a possible 30 on the MMSE.[6] Dr. Randolph found Jackson "was oriented X2." His memory was very poor, and he "[c]ould not name the US President beyond Bush." Dr. Randolph found Jackson's math, spelling and language were severely impaired. Dr. Randolph found his mood and

---

[5] Perseveration is the "persistence or repetition of a response after the causative stimulus has ceased or in response to different stimuli." *Dorland's Illustrated Medical Dictionary* 1266 (28th Ed. 1994).

[6] The Mini-Mental State Examination (MMSE), is "a brief psychologic test designed to differentiate among dementia, psychosis, and affective disorders. It may include ability to count backward by 7s from 100, to identify common objects such as a pencil and a watch, to write a sentence, to spell simple words backward, and to demonstrate orientation by identifying the day, month, and year, as well as town and country." *Mosby's Medical Dictionary*, (8th Ed. 2009), http://medical-dictionary.thefreedictionary.com/MMSE (last visited February 24, 2014).

affect were dulled and blunted, with poor reactivity. He noted Jackson's grooming was impaired. Dr. Randolph also noted Jackson alluded to hallucinations. R. 547.

Dr. Randolph diagnosed Jackson with Organic Mood Disorder, multiple etiologies, and Substance Abuse. He assessed Jackson's GAF as 40.[7] R. 547. Dr. Randolph's narrative discussion contains the following: "This patients [sic] intellectual impairments are to the severity that a psychiatric disability exists. He is unemployable. He has a poor prognosis. His symptoms due to organicity will be expected to worsen with time." R. 548.

Dr. Randolph completed a Medical Source Statement, indicating Jackson had extreme limitations in all categories. R. 543-44. He did not answer the question on the form asking whether Jackson's alcohol and/or substance abuse contributed to the limitations indicated on the form. R. 544.

The ALJ also had Jackson examined on May 19, 2011, by Dr. Norwood, a neurologist. R. 550-559. Jackson reported to Dr. Norwood that "[h]e began having vision blackouts after his [June 2010 motor vehicle accident]." R. 550. He reported these blackouts cause "global dimming and loss of vision in the right eye associated with wobbling gait, poor balance, [and] falling." Jackson has no vision in his left eye. R. 550.

---

[7] A GAF of 31-40 reflects: "**Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34 (emphasis in original).

On examination, Dr. Norwood found Jackson had good range of motion in the neck, spine and limbs. His gait was not remarkable. Dr. Norwood noted Jackson's left arm was smaller than the right. He found Jackson could oppose his thumbs bilaterally, but Dr. Norwood was able to overcome that on the left. Dr. Norwood found that "[o]therwise strength was normal in the arms and legs." R. 550.

Dr. Norwood's impression included the following: "Left arm is smaller than the right and this has likely been present since birth or early childhood with remarkably little neurologic deficit associated with that finding." R. 550. Dr. Norwood opined that "this would interfere with his ability to do work which requires heavy lifting and carrying with the left arm, [and] reaching, pushing and pulling with the left arm." R. 550-51. Dr. Norwood stated that he did not find "any other neurologic deficit or evidence of other physical neurologic impairment to do work related activities including sitting, standing, walking, lifting and carrying with the right arm, [and] handling objects with the right hand." Dr. Norwood's narrative impression stated that Jackson's "reported episodes of vision loss and dizziness would make it unsafe for him to . . . work from a ladder or scaffold." R. 551. Dr. Norwood's report does not mention any cognitive or intellectual deficits.

On a Medical Source Statement form supplied by the Commissioner, Dr. Norwood checked a box indicating Jackson could never climb ladders or scaffolds. R. 556. Dr. Norwood indicated Jackson could only occasionally use his left hand for

14

activities including reaching, handling, fingering, pushing, and pulling. R. 555. Dr.

Norwood indicated Jackson could continuously lift and carry up to 10 pounds, and

frequently lift and carry up to 20 pounds. R. 553. He indicated Jackson could sit for two

hours, stand for one hour, and walk for one hour at a time. Dr. Norwood indicated

Jackson could sit for a total of six hours, stand for a total of two hours, and walk for a

total of two hours, all in an eight-hour workday. R. 554.

## IV. ISSUES PRESENTED

Jackson raises the following issues on appeal: 1) whether the ALJ properly

considered the opinions of the consultative examiners in assessing Jackson's mental RFC

in the absence of substance abuse; 2) whether the ALJ properly found Jackson could

occasionally climb ladders and scaffolds; and 3) whether the ALJ properly considered the

impairment to Jackson's left hand in assessing his physical RFC.

## V. DISCUSSION

### A.

Jackson bears the burden of proving that his substance abuse is not a contributing

factor material to his disability. *Doughty v. Apfel*, 245 F.3d 1274, 1280 (11th Cir. 2001).

Therefore, he must show that he would be unable to perform the jobs identified by the

ALJ even if his substance abuse stopped.

Jackson argues the ALJ erred in assessing what his mental RFC would be in the absence of substance abuse.[8] Jackson argues the ALJ improperly failed to credit Dr. Rogers' finding of marked impairments in Jackson's concentration, persistence and pace, and in his ability to respond to customary work pressure. Pl.'s Br. 6. He also argues that Dr. Randolph's finding of extreme restrictions in all areas contradicts the ALJ's mental RFC finding.

In determining how much weight to give to each medical opinion, the ALJ must consider several factors, including (1) whether the doctor has examined the claimant; (2) whether the doctor has a treating relationship with the claimant; (3) the extent to which the doctor presents medical evidence and explanation supporting his opinion; (4) whether the doctor's opinion is consistent with the record as a whole; and (5)  whether the doctor is a specialist. 20 C.F.R. § 416.927(c). Although Dr Rogers and Dr. Randolph did examine Jackson, they are not treating physicians. Therefore, the ALJ was not required to give their opinions controlling weight under 20 C.F.R. § 416.927(c)(2). Moreover, even the opinions of treating physicians may be rejected "when the evidence supports a contrary conclusion." *Bloodworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983).

---

[8]  Two RFC findings are in this case. One included the vocational impacts of Jackson's substance abuse. The other, which is the RFC finding at issue on appeal, was based on the impact of Jackson's impairments in the absence of substance abuse. Future references to Jackson's RFC are to his RFC in the absence of substance abuse.

The ALJ summarized the opinions of Dr. Rogers, Jackson's psychological consultant, as follows:

> It is true that the claimant reported ongoing substance abuse to Dr. Rogers in February 2011, and Dr. Rogers remarked that the level of severity, which includes marked deficits in the area of concentration, persistence, or pace, will apply without consideration of substance abuse (Exhibit 3F). Although Dr. Rogers noted in the report that the claimant had used marijuana as recently as three to four weeks prior to the evaluation and had used pain pills four days prior to the evaluation, he remarked in the end that the claimant's substance abuse was in remission.

R. 28-29. The ALJ, however, found the evidence supported finding Jackson's substance abuse had not ended.

The ALJ observed that Jackson had indicated at his hearing in March 2011 "he had recently used pain pills, which were presumably not prescribed for him since he indicated his only prescribed medication is an enzyme drug for his pancreas." R. 29. The ALJ also found Jackson had "denied substance abuse but was later found to have provided false information as reflected by positive drug tests." R. 29. The treatment note that the ALJ was referring to states Jackson "denies use of street drugs, however, urine drug screen is positive for opiates, benzodiazepines and marijuana." R. 417. The ALJ concluded that "[i]n stressing that cognitive damage from a traumatic brain injury was the reason for the claimant's marked concentration, persistence, or pace abilities, Dr. Rogers did not adequately consider the impact of substance abuse." R. 29. He found that Dr. Rogers "uncritically accepted the claimant's report of abstinence, which contrasts with other evidence, and emphasized the effects of traumatic brain injury." R. 29.

17

The ALJ also found the report of Dr. Norwood, the consultative neurologist, was inconsistent with the level of impairment found by Dr. Rogers. R. 29. He observed that Dr. Norwood's "neurological findings . . . were not too significant," and were not consistent with Dr. Rogers' findings. R. 29. Therefore, the ALJ concluded the "portion of Dr. Rogers' opinion in which he opined generally marked concentration, persistence, or pace difficulties without consideration of substance abuse is not supported by the record." R. 29.

The ALJ also found Dr. Randolph, the Commissioner's consultative psychiatrist, relied on Jackson's reports of abstinence in formulating his opinions. The ALJ noted Jackson "reported to Dr. Randolph in April 2011 that he had been abstinent from stimulants and marijuana for one year and that Dr. Randolph opined generally extreme mental deficits with no comment about how substance abuse contributes to the claimant's limitations." R. 29 However, the ALJ again found Jackson's "reports of abstinence are unreliable for the reasons previously discussed." R. 29. The ALJ observed Jackson "reported abstinence for a period of one year to Dr. Randolph but admitted more recent use to Dr. Rogers in February 2011 and at the hearing, which further casts doubt on the reliability of the claimant's reported history to examiners and their resulting opinions." R. 29. The ALJ also observed that a "third party also confirmed regular methamphetamine use." R. 29. The report was from June 4, 2010, when Jackson was involved in a motor vehicle accident, and his family reported "he injects methamphetamines." R. 285.

18

The ALJ also found Dr. Norwood's neurological findings were inconsistent with Dr. Randolph's finding of extreme impairments. "Dr. Randolph stressed extreme limitations as a result of an organic mental disorder, but Dr. Norwood's neurological findings were again not that significant and not consistent with such extreme findings." R. 29 Therefore, the ALJ concluded "Dr. Randolph's estimation about the claimant's degree of limitation is not persuasive." R. 29.

In considering the extent of Jackson's mental impairments, the ALJ stressed that he had "considered whether there is a physical condition responsible for [Jackson's] mental symptoms to include his allegations of concentration difficulties and blackouts." R. 29. The ALJ found that Dr. Norwood's neurology evaluation in May 2011 was "not supportive of significant findings." R. 29. He observed that Jackson was "presumably sober during the examination since Dr. Norwood indicated no impression of substance abuse and noted no mood or psychiatric abnormality." R. 29. Therefore, the ALJ found Jackson's functioning during Dr. Norwood's examination was a better indicator of his abilities in the absence of substance abuse. R. 29. The ALJ concluded that the "objective testing performed by Dr. Norwood clearly documents the claimant's mental capacity for work and further undermines the opinions of Dr. Rogers and Dr. Randolph." R. 29.

For these reasons, the ALJ gave only partial weight to the opinions of Dr. Rogers and Dr. Randolph. R. 30. The ALJ found that "their findings appear generally persuasive when considering the additional effect of substance abuse." R. 30. However, he found

19

the opinions were not persuasive as to Jackson's abilities in the absence of substance

abuse. R. 30.

The ALJ properly considered the opinions of Dr. Rogers and Dr. Randolph, and

found that the evidence supported a contrary conclusion. *See Bloodworth,* 703 F.2d at

1240. He articulated reasons supported by substantial evidence for giving those opinions

only partial weight in assessing Jackson's RFC. Therefore, the ALJ did not err in his

consideration of the opinions of Dr. Rogers and Dr. Randolph.

Jackson also emphasizes that Dr. Randolph opined Jackson's "intellectual

impairments are to the severity that a psychiatric disability exists," and that "[h]e is

unemployable." Pl.'s Br. 7. However, these are issues reserved to the Commissioner, and

are not medical opinions. The regulations provide as follows:

> Opinions on some issues, such as the examples that follow, are not medical
> opinions . . . but are, instead, opinions on issues reserved to the
> Commissioner because they are administrative findings that are dispositive
> of a case; i.e., that would direct the determination or decision of disability.
>
> > (1) *Opinions that you are disabled.* We are responsible for making
> > the determination or decision about whether you meet the statutory
> > definition of disability. In so doing, we review all of the medical
> > findings and other evidence that support a medical source's
> > statement that you are disabled. A statement by a medical source that
> > you are "disabled" or "unable to work" does not mean that we will
> > determine that you are disabled.

20 C.F.R. § 416.927(d)(1); s*ee Denomme v. Commissioner, Social Sec. Admin.* 518 F.

App'x 875, 878 (11th Cir. 2013) (finding doctor's statement that claimant's condition

would "likely prevent her from maintaining gainful employment" was not a medical

assessment) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)).

Therefore, the ALJ was not required to consider these opinions of Dr. Randolph

as medical opinions. Moreover, the reasons given by the ALJ for not crediting Dr.

Randolph's findings of extreme limitations in all areas also provides substantial support

for his failure to adopt Dr. Randolph's opinions that a psychiatric disability exists and

that Jackson is unemployable.

## B.

Jackson's argues the ALJ erred in finding he could occasionally climb ladders and

scaffolds. Pl.'s Br. 7. Jackson argues the ALJ should have adopted the opinion of Dr.

Norwood, the Commissioner's consultative neurologist, who indicated on a form that

Jackson should never climb ladders or scaffolds. Pl.'s Br. 8.

Jackson reported to Dr. Norwood that "[h]e began having vision blackouts after

his [June 2010 motor vehicle accident]." R. 550. He reported these blackouts cause

"global dimming and loss of vision in the right eye associated with wobbling gait, poor

balance, [and] falling." R. 550. On a Medical Source Statement form supplied by the

Commissioner, Dr. Norwood checked a box indicating Jackson could never climb

ladders or scaffolds. 556. However, Dr. Norwood's narrative impression was that

Jackson's "reported episodes of vision loss and dizziness would make it unsafe for him

to . . . *work* from a ladder or scaffold." R. 551 (emphasis added).

In finding Jackson could climb ladders and scaffolds on an occasional basis, the ALJ gave great weight to the opinion of Dr. Anderson, the medical expert who testified at Jackson's ALJ hearings. Dr. Anderson, who was aware Jackson had no vision in his left eye, testified that he would be able to occasionally climb ladders and scaffolds.[9] R. 123. The ALJ stated that Dr. Anderson's opinion was given great weight "based on its consistency with the record." R. 28; *see* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). The ALJ observed that by November 2010, Jackson "was able to engage in such vigorous activity as backyard football." R. 28. He also noted that Jackson had not undergone regular follow-up treatment after his June 2010 accident. R. 30.

In addition to relying on the testimony of Dr. Anderson, the ALJ observed that Dr. Norwood's evaluation "did not reveal significant neurological deficits fully supportive of the claimant's allegations." R. 28. This observation is significant because Dr. Norwood stated that his opinion that Jackson could never climb ladders or scaffolds was based on Jackson's reported episodes of vision loss, dizziness, and blackouts. R. 551, 556. His objective examination findings and testing do not support these restrictions. *See* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to

---

[9] At the time of Dr. Anderson's testimony, Dr. Norwood had not yet examined Jackson.

support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

Dr. Norwood was not a treating physician, and as with Dr. Rogers and Dr. Randolph, the ALJ was not required to give his opinion controlling weight. The testimony of Dr. Anderson, and Dr. Norwood's failure to find significant neurological deficits on examination, constitute substantial evidence to support the ALJ's finding that Jackson could occasionally climb ladders or scaffolds.

However, even if the ALJ erred in failing to find Jackson could never climb ladders or scaffolds, that error was harmless. At the ALJ hearing, the vocational expert (VE) testified that with the RFC assessed by the ALJ, Jackson would be able to perform his prior work as a "cleaner of such things as . . . coke machines."[10] R. 127. The VE testified that the job of cleaner was listed in the Dictionary of Occupational Titles (DOT) at 323.687-014.[11] R. 127. The VE also testified Jackson would be able to perform the job of laundry worker, and the ALJ found that he could perform that job based on that testimony. R. 127, 31.

---

[10]  The ALJ's found that this job did not qualify as past relevant work because Jackson had insufficient earnings. R. 30. The ALJ did not find Jackson was unable to perform the job.

[11]  The Dictionary of Occupational Titles is published by the Department of Labor and used by the Commissioner to take administrative notice of the presence of jobs in the national economy.  20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1).

Climbing is not required for either of these jobs. *See* DICOT 323.687-014, 1991 WL 672783 (G.P.O.); DICOT 369.387-010, 1991 WL 673053 (G.P.O.). Therefore, any error by the ALJ was harmless. *See Timmons v. Comm'r of Soc. Sec.*, 522 F. App'x 897, 906 (11th Cir. 2013) (unpublished) (finding the omission of a squatting restriction from the RFC assessment was harmless error because the DOT showed squatting was not required by the jobs identified by the ALJ).[12]

## C.

Jackson argues that the jobs identified by the vocational expert "would all appear to require good use of both hands." Pl.'s Br. 8. This argument is based on Dr. Norwood's examination, and is directed at the ALJ's RFC finding, which did not include any restrictions in the use of Jackson's left arm.

In his examination, Dr. Norwood noted Jackson's left arm is smaller than the right. R. 550. Dr. Norwood found Jackson could oppose his thumbs bilaterally, but he was able to overcome that on the left. R. 550. However, Dr. Norwood found that "[o]therwise strength was normal in the arms and legs." R. 550.

---

[12]   The present case is distinguishable from *Dial v. Comm'r of Soc. Sec.*, 403 F. App'x 420, 421 (11th Cir. 2010) (unpublished), in which the Court found that because the ALJ had relied only on the testimony of the VE, the DOT could not be used to find an error harmless. In the present case, the VE testified that his testimony was consistent with the DOT, and the ALJ found that is was. R. 126, 31. Because the VE's testimony was consistent with the DOT, it is appropriate to consider the DOT in determining whether any error by the ALJ was harmless in the present case.

Dr. Norwood's impression included the following: "Left arm is smaller than the right and this has likely been present since birth or early childhood with remarkably little neurologic deficit associated with that finding." R. 550. Dr. Norwood opined that "this would interfere with his ability to do work which requires heavy lifting and carrying with the left arm, [and] reaching, pushing and pulling with the left arm." R. 550-51. On the Medical Source Statement, Dr. Norwood indicated Jackson could only occasionally use his left hand for activities including reaching, handling, fingering, pushing, and pulling. R. 555.

The ALJ found that Dr. Norwood's "opinion with respect to . . . left upper extremity limitations [is] particularly unpersuasive." R. 30. To support this finding, the ALJ cited Jackson's failure to undergo regular follow-up treatment after his June 2010 motor vehicle accident, and his ability to engage in such activities as football by November 2010. R.30. The ALJ also observed that "the claimant has not complained of left upper extremity problems." R. 30. Therefore, he concluded "the record as a whole does not support limitations greater than determined herein." R. 30; *see* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

These reasons recited by the ALJ constitute substantial evidence to support his decision not to include the left arm restrictions indicated by Dr. Norwood in his RFC finding. Jackson's failure to complain of problems with his left arm is significant because

25

the condition has been present since childhood and did not prevent him from engaging in work at the heavy and medium levels of exertion as a mason's helper and painter. Therefore, the ALJ did not err in refusing to credit Dr. Norwood's opinions.

## VI. CONCLUSION

The court concludes the ALJ's determination that Jackson is not disabled is supported by substantial evidence, and that the ALJ applied the proper legal standards in arriving at this decision. Accordingly, the Commissioner's final decision is due to be affirmed. An appropriate order will be entered.

DONE and ORDERED this 6th day of March, 2014.

_____
     KARON OWEN BOWDRE
     CHIEF UNITED STATES DISTRICT JUDGE